James M. **ABRAHAM**, O.D., et al., Plaintiffs,

v.

**INTERMOUNTAIN HEALTH CARE, INC.**, et al., Defendants.

No. Civ. 2:01–CV–0919J.

United States District Court, D. Utah, Central Division.

Feb. 10, 2005.

Daniel L. Berman, Peggy A. Tomsic, Berman Tomsic & Savage, Salt Lake City, UT, for Plaintiffs.

Gary F. Bendinger, Richard W. Casey, John H. Bogart, Ryan B. Frazier, Bendinger Crockett Peterson & Casey, James S. Jardine, Jonathan A. Dibble, John W. MacKay, Ray Quinney & Nebeker, Thomas R Karrenberg, Nathan B. Wilcox, Anderson & Karrenberg, Salt Lake City, UT, for Defendants.

George A Hunt, Andrew G. Deiss, Williams & Hunt, David C. Wright, White Mabey Wright & Richards, Salt Lake City, UT, for Movants.

## MEMORANDUM OPINION & ORDER

JENKINS, Senior District Judge.

There are nearly thirty motions currently pending in this matter. Some are ancillary, redundant or surplus. Some five are fundamental, namely: (1) the motions for summary judgment of IHC defendants (dkt. nos.717, 719, 723); (2) the motion for summary judgment of defendant Miller (dkt. no. 882); and (3) the motion for summary judgment of defendant Brodstein (dkt. no. 715). The pending motions for summary judgment came before the court for hearing on May 3, 4 and 5, 2004. Daniel L. Berman and Peggy A. Tomsic appeared on behalf of Plaintiffs; Gary F. Bendinger, Richard W. Casey, John H. Bogart and William G. Kopit appeared on behalf of the IHC Defendants; James Jardine and John McKay appeared on behalf of defendant Dr. Corey A. Miller, M.D.; and Thomas Karrenberg and Nathan Wilcox appeared on behalf of defendants Dr. David E. Brodstein, M.D., and Country Hills Eye Center, Inc. For three days, the court heard argument by counsel concerning their respective motions, and at the conclusion of the hearing, took the matter under advisement. Thereafter, for seven days in July of 2004, the court conducted a Pretrial Conference and evidentiary hearing on the admissibility of the parties' proffered expert testimony pursuant to Fed.R.Evid. 702 and in consideration of several pending motions to strike or exclude proffered expert opinions. (See Minute Entry, dated July 7–9, 12–15, 2004 (dkt. no. 906).) In the exercise of its "gatekeeper" function under Rule 702,[1] the court heard the proffered testimony of the

---

1. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

parties' expert witnesses, whether they were the subject of a pending motion *in limine* or not. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221–29 (10th Cir.), *cert. denied*, 540 U.S. 1003, 124 S.Ct. 533, 157 L.Ed.2d 408 (2003). At the conclusion of the evidentiary hearing, the court took the pending motions *in limine* and questions of Rule 702 admissibility under advisement.

The court has reviewed and considered the parties' voluminous written and documentary submissions concerning the pending motions for summary judgment, including post-hearing documentary supplements and the proffered opinions of the parties' respective expert witnesses.

## Optometrists, Ophthalmologists & Plaintiffs' Antitrust Claims

Plaintiffs are all optometrists (or corporate structures that employ optometrists) along the Wasatch Front.[2] None are currently members of the panels of health care providers designated by various private limited health care plans sponsored by Intermountain Health Care ("IHC"). Many of the Plaintiff optometrists are members of provider panels of health care plans offered by other health insurers in competition with the IHC-sponsored plans. All would like to be appointed to the IHC-sponsored provider panels, and thus become eligible to be paid by those plans for non-surgical eye care services provided to IHC enrollees.

Essentially all of the IHC panel providers for eye care—surgical and non-surgical—are ophthalmologists, medical doctors, who have active staff or courtesy privileges at one or more IHC hospitals or surgical facilities and who provide both surgical and non-surgical eye care services for the enrollees of IHC-sponsored health care plans. Though credentialed with doctorate degrees in optometry and licensed by the State of Utah to provide eye care services,[3] optometrists have no hospital privileges and do not perform surgery.[4]

Optometrists' services and the "non-surgical" eye care services provided by ophthalmologists do overlap. Non-surgical eye care services are in most respects similar in the work that is performed, including eye examinations for defects or abnormal conditions, diagnosis of cataracts, eye diseases (*e.g.,* pink eye, glaucoma), prescription of corrective lenses, pharmaceutical agents, or other devices, and the removal of foreign objects from the vicinity of the eye not requiring surgery. They may also be similar in the sale of hardware (glasses, contact lenses, etc.) or other eye care supplies.[5]

Plaintiffs complain that the IHC Defendants have conspired with the IHC panel ophthalmologists[6] to exclude optometrists

---

**2.** By "Wasatch Front," the Plaintiffs refer to Salt Lake, Davis, Weber, Cache, Utah and western Summit counties in the State of Utah. (*See* Second Amended Complaint, filed February 17, 2004 (dkt. no. 796), at 23 ¶ 67.)

**3.** *See* Utah Code Ann. § 58–16a–101 *et seq.* (2002 & Supp.2004) (Utah Optometry Practice Act).

**4.** *See* Utah Code Ann. § 58–16a–102(11) (2002) ("'Optometry' and 'practice of optometry'" defined).

**5.** (*See* Second Amended Complaint, filed February 17, 2004 (dkt. no. 796), at 27 ¶ 77.)

**6.** Plaintiffs allege that the scope of the IHC Defendants' conspiracy encompasses *all* of the ophthalmologists that have been appointed to IHC provider panels—over "70% of the ophthalmologists on the Wasatch Front," according to their pleadings. (Sec. Amd. Cmplt at 22 ¶ 64 ("Ophthalmologists serving on the IHC provider panels knowingly and actively participated as conspirators in the antitrust violations as alleged ... and each has performed acts in furtherance of the contracts, combinations and conspiracies as alleged ...."); *id.* at 29 ¶ 82.) Plaintiffs have named two of these "IHC ophthalmologists" as "defendant ophthalmologists" in this action, Drs.

as a class from providing non-surgical eye care services to the enrollees in IHC private health care plans and other affiliated plans by refusing to include Plaintiff optometrists on IHC-sponsored plan provider panels, the members of which provide non-surgical eye care services to enrollees of IHC-sponsored and affiliated health plans in return for payment under the terms of the plan. (*See* Second Amended Complaint, filed February 17, 2004 (dkt. no. 796) ("Sec.Amd.Cmplt."), at 32–46 ¶ 87(1)-(7).) Plaintiffs assert that the purpose of such exclusion was to increase IHC's dominant market position in the use of hospital and surgical facilities on the Wasatch Front by requiring its panel ophthalmologists to use IHC's hospital and surgical facilities when surgical eye care is needed by their patients. (*Id.*)

Plaintiffs further complain that IHC health care plan enrollees are required not to purchase non-surgical eye care from optometrists as a class, and that such amounts to a statutorily prohibited "negative tie"; and that enrollees are required to purchase non-surgical eye care services from the IHC plans' panel providers, claiming the same to be a statutorily prohibited "positive tie." (*Id.* at 38–42 ¶ 87(3)-(4).)

Further, the Plaintiffs allege that IHC Defendants require IHC ophthalmologists to agree to use IHC hospital and surgical facilities when needed for *all* of their surgical care patients, including patients with non-IHC health care coverage (*e.g.,* Medicare), in exchange for being designated as panel providers for IHC-sponsored and affiliated plans.

Plaintiffs contend that the limitation of IHC panel providers to IHC hospital-privi-

leged ophthalmologists, thereby excluding optometrists from provider panels, and the requirement that IHC ophthalmologists use IHC surgical facilities, are unlawful, monopolistic, anti-competitive and in restraint of trade, all in violation of Sections 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C.A. §§ 1, 2 (1997).

Plaintiffs ask that the court adjudge that the IHC Defendants and the IHC panel ophthalmologists have engaged in: (1) an illegal group boycott, "a contract in restraint of trade" and concerted refusal to deal; (2) illegal tying arrangements, and (3) a conspiracy and/or an attempt to monopolize the hospital and surgical facilities market in restraint of trade. As relief, they ask the court to compel the defendants (1) "to approve and include each plaintiff optometrist as a duly authorized provider for non-surgical eye care services within the scope of their licensure' for all enrollee/patients under each and every IHC private health care plan and IHC affiliated plan," now and in the future; (2) to revise and reissue the publications of such plans which list approved providers to include the Plaintiff optometrists, and (3) to pay damages to compensate the Plaintiffs for an estimated $ 28 million in lost profits resulting from the alleged illegal activities. (Sec. Amd. Cmplt. at 52–53 [Prayer for Relief] ¶¶ 6, 8 & 9.) [7]

### Plaintiffs' Claims & Federal Antitrust Law

15 U.S.C.A. § 1 (1997) states in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign na-

---

Miller and Brodstein. (*Id.* at 20–21 ¶¶ 61–63.)

**7.** The $28 million lost profit damages estimate is based upon the work of Plaintiffs'

expert witness, Rick Hoffman, CPA, and differs from the $45 million estimate pleaded in ¶ 91 of the Second amended Complaint. (Sec. Amd. Cmplt. at 50 ¶ 91.)

tions, is hereby declared to be illegal. . . .

15 U.S.C.A. § 2 (1997) states in part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, . . . .

Section 4 of the Clayton Act, 15 U.S.C.A. § 15 (1997), provides in part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" in an appropriate federal district court "and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Section 16 of the Clayton Act, 15 U.S.C.A. § 26 (1997), provides in part that "[a]ny person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws," including Sections 1 and 2 of the Sherman Act, "when and under the same conditions and principles as injunctive relief . . . is granted by courts of equity." Section 4 of the Clayton Act "requires a plaintiff to show actual injury, but § 16 requires a showing only of 'threatened' loss or damage[.]" *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). However, "under both § 16 and § 4 the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent." *Id.* (footnote omitted).

■ Indeed, "[s]tanding and antitrust injury are essential elements in a private antitrust damages action brought under section 4 of the Clayton Act." *Reazin v. Blue Cross and Blue Shield of Kansas*, 899 F.2d 951, 960 (10th Cir.1990) (citing *Car-*

*gill*, 479 U.S. at 110, 107 S.Ct. 484; *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). According to the court of appeals, the following factors are "to be considered in determining antitrust standing:"

the causal connection between the antitrust violations and plaintiff's injury; the defendant's intent; the nature of the plaintiff's injury; the directness or indirectness of the connection between the plaintiff's injury and the allegedly unlawful market restraint; the speculativeness of the plaintiff's damages; and the "risk of duplicative recoveries . . . or the danger of complex apportionment of damages." *Associated Gen. Contractors*, 459 U.S. at 544, 103 S.Ct. at 912.

*Id.* at 962 n. 15. The "nature of the plaintiff's injury factor" is "designed to implement the requirement that only *antitrust* injuries are redressable under section 4." *Id.* (emphasis in original).

■ "Antitrust injury" is demonstrated " 'by a causal relationship between the harm and the challenged aspect of the alleged violation of the federal antitrust laws.' " *Id.* at 961 (quoting *Alberta Gas Chems., Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988).).

An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." . . . It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.

*Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476–77, 102 S.Ct. 2540, 73

L.Ed.2d 149 (1982) (citation omitted). In evaluating a private plaintiff's standing under § 4, "we look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff," and "(2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Id.* at 478, 102 S.Ct. 2540.[8] The "injury suffered by the plaintiff must be of the type the antitrust laws were intended to forestall." *Id.* at 484 n. 21, 486, 102 S.Ct. 2540; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (an antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful").

"To prevail, a private plaintiff must establish both (1) that it has standing *and* (2) the defendant has violated the antitrust laws.... [T]he antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation." 2 Phillip E. Areeda, Herbert Hovencamp & Roger D. Blair, *Antitrust Law* ¶ 335, at 297 (2d ed.2000) (footnote omitted). A "plaintiff seeking injunctive relief must generally meet all the requirements that apply to the damage plaintiff, except that the injury itself need only be threatened and damage need not be quantified." *Id.* at 288. "Once it appears, whether early or late in the litigation, that either

requirement [of standing or antitrust violation] is lacking, the suit must be dismissed." *Id.* at 297.

### Plaintiffs' Standing & IHC's Market Power

■ Plaintiffs in this case, of course, are outspoken advocates of the virtues of competition and feel deprived by the absence of the opportunity to provide their services, duly credentialed and licensed by the State of Utah, to the large pool of enrollees in the seven IHC-sponsored limited health care plans and affiliated plans, in direct competition and on an equal footing with the IHC ophthalmologist panel providers. The market is significant, estimated by some to be in the neighborhood of 60% of total health care plan enrollees on the Wasatch Front.

IHC thus has a significant presence in the "managed care" (private limited health care plan) market. IHC also has a significant, if not dominant, presence in the hospital and surgical facilities market along the Wasatch Front. IHC has some medical practitioners on its payroll, but for the most part, it is in the hospital and surgical facilities business, and in the "managed care" limited health plan business. The IHC Defendants are not directly engaged in the providing of surgical or non-surgical eye care services. Of course, their designated panel providers, the IHC ophthalmologists, are engaged in both.

In the abstract, at least, the Plaintiff optometrists already compete with IHC

---

**8.** Ms. McCready, a subscriber to a group health care plan who had been denied reimbursement by the plan for the cost of services of a clinical psychologist, brought her suit under § 4, alleging that the plan had conspired with a professional association of physicians and psychiatrists to exclude psychologists from receiving payment under the plan for outpatient treatment of mental disorders, including psychotherapy in violation of § 1 of the Sherman Act. 457 U.S. at 467–70, 102

S.Ct. 2540. The Court concluded that "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market. In light of the conspiracy here alleged we think that McCready's injury 'flows from that which makes defendants' acts unlawful ... and falls squarely within the area of congressional concern." *Id.* at 484, 102 S.Ct. 2540 (footnote omitted).

panel ophthalmologists: enrollees of IHC plans currently may elect to patronize an optometrist for non-surgical eye care, and pay for services directly out of the enrollee's own pocket; but the practicalities of life may dissuade most not to do so, relying instead on their health plan to pick up all or part of the tab when an enrollee selects a preferred provider from the plan's panel.[9] Other than in defined emergencies, plan benefits would not be paid when an enrollee does not select a preferred panel provider for non-surgical eye care services.

At the same time, Plaintiffs as optometrists have nothing to do with surgical care, or with hospitals or surgical facilities. They do not compete in the market for surgical facilities or surgical health care services, and within the limits of their existing state licensure, have no occasion to seek entry into the surgical facilities market.

Whatever the merits of Plaintiffs' assertions that the IHC Defendants have used their market power in the private "managed care" health plan market to increase their market power in the hospital and surgical facilities market, Plaintiffs as licensed optometrists are not competing in either market; nor are they seeking to enter either market. In terms of "the causal connection between the antitrust violations and plaintiff's injury," *Reazin*, 899 F.2d at 962 n. 15, the Plaintiffs' alleged injury in this case does not result from any threat to competition that underlies the IHC Defendants' alleged antitrust law violations with respect to IHC's use of market power in the "managed care" limited health plan market to inhibit competition in the hospital/surgical facilities market. Examining Plaintiffs' claims concerning IHC's attempts to monopolize the surgical facilities market with respect to "the di-

rectness or indirectness of the connection between the plaintiff's injury and the allegedly unlawful market restraint," *id.*, the assertion that IHC requires ophthalmologists to utilize IHC surgical facilities for all of their surgical eye care patients as a *quid pro quo* for either their appointment to provider panels or the exclusion of optometrists from IHC provider panels suggests at most an indirect connection between Plaintiffs' alleged injury and IHC's alleged attempt to monopolize the surgical facilities market. The Plaintiffs' "particular injury is too remote from the alleged violation to warrant § 4 standing," *Blue Shield of Virginia v. McCready*, 457 U.S. at 477, 102 S.Ct. 2540, and Plaintiffs lack standing to seek redress under either § 4 or § 16 of the Clayton Act for the IHC Defendants' alleged wrongdoing in the hospital/surgical facilities market.

### Plaintiffs' Tying Claims

■ Utah's Insurance Code provides some guidance as to the players involved in private limited health care plans. provides that an " '[o]rganization' means a health maintenance organization and limited health plan," and that all such organizations need to be authorized by the State of Utah. Utah Code Ann. § 31A–8–101(8), 31A–8–102, 31A–8–104, 31A–8–213 (2003). All of the IHC Defendants' "managed care" organizations have been so authorized, including the various IHC-sponsored limited health plans and affiliated plans.

Utah Code Ann. § 31A–8–101(6) defines a "limited health plan" as one "who furnishes, either directly or through arrangements with others, services" of health care providers "to an enrollee" in "return for prepaid periodic payments agreed in amount prior to the time during which the services may be furnished[.]" Given such

---

9. Substantially all of the IHC eye care panel providers on the Wasatch Front are IHC hospital-privileged M.D. ophthalmologists, not licensed optometrists.

prepayment, a limited health plan "is obligated to the enrollee to arrange for or directly provide the available and accessible services" of health care providers. Utah Code Ann. § 31A–8–101(3) provides: "'Enrollee' means an individual: (a) who has entered into a contract with an organization for health care; or (b) in whose behalf an arrangement for health care has been made." Utah Code Ann. § 31A–8–101(10) defines a "provider" to mean "any person who: (a) furnishes health care directly to the enrollee; and (b) is licensed or otherwise authorized to furnish the health care in this state."

According to the Plaintiffs, "Private health care plans generally finance health care services ... provided by independent non-employee professionals ... who contract with the private health care plans to provide such services ... to enrollees/patients in the private health care plans." (Sec. Amd. Cmplt. at 23 ¶ 66.) Utah Code Ann. 31A–8–105(2) expressly empowers limited health plan organizations to "furnish health care through providers which are under contract with the organization[.]"

All providers under contract with each IHC health care plan acknowledge their independent professional status, and expressly disavow any employee status with the IHC-sponsored or affiliated health care plans. Some, on occasion, terminate their provider status voluntarily; others involuntarily, or by non-renewal of their provider contract by the IHC-sponsored plan. In all instances, the services provided by IHC's panel providers are their own product "arranged for" enrollees under contract with IHC, and are not services provided directly by any IHC plan organization or its employees.

This distinction between "plan" and "provider" bears directly upon the Plaintiffs' "tying" claims.

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *see Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich*, 63 F.3d 1540, 1546 (10th Cir.1995).

To begin with, "there can be no unlawful tie-in unless the arrangement involves two separate products." 1 American Bar Association Section of Antitrust Law, *Antitrust Law Developments (Fifth)* 180 (5th ed.2002). It seems "clear that a tying arrangement cannot exist unless two separate product markets have been linked." *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 21, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

In *Jefferson Parish*, the Court concluded that anesthesiology services were a product separate from other facilities and services provided by the defendant hospital. 466 U.S. at 18–19, 104 S.Ct. 1551. In *Eastman Kodak Co. v. Image Technical Services, Inc.*, the Court likewise ruled that whether maintenance service and replacement parts for Kodak photocopiers and other equipment constituted separate products raised a triable issue of fact. 504 U.S. at 462–63, 112 S.Ct. 2072. In these and other anti-tying cases, the "common core" of a tie-in "is the forced purchase of a second distinct commodity." *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 605, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

Here, however, through their private limited health care plans, the IHC Defendants are marketing a single product: *access to health care* priced to subscribers and paid to health care providers according to prior arrangements made with those

providers. (*See* Sec. Amd. Cmplt. at 23 ¶ 66 ("Private health care plans and the financing they provide are now essential to enrollee/patients *to gain access* to the health care system . . . .") (emphasis added).) The IHC-sponsored and affiliated plans furnish health care services "through arrangements with others" already made, pursuant to which participating "providers" furnish health care directly to enrollees and the plan makes direct payment to those providers as agreed. The plans are selling the economic advantage of a network of relationships, and a subscriber to a plan buys access to that network of relationships for the benefit of enrollees who choose to utilize the relationships thus made accessible.

Plaintiffs' tying claims attempt to carve the enrollees' access to health care services into two separate "products," arguing that the sale of the "managed care plan," or more specifically, the plan's "administration" of its payment obligation (the "tying product") is "conditioned" upon enrollee use of the panel providers for all eye care services and avoidance of non-panel optometrists for non-surgical eye care services (the "tied product"). (*See* Sec. Amd. Cmplt. at 38–42 ¶ 87(3)-(4)). Yet a private limited health care plan's "product" is not merely the "administration" of payment for services rendered—a product indistinguishable from more traditional health insurance indemnity policies; the product is enrollee *access* to the plan's limited network of relationships, its portfolio of advantageous "arrangements" for health care services through its existing contractual relationships with specific health care providers. A plan subscriber (usually an employer) purchases enrollee access to the plan's "arranged for" services, not merely the plan's "administration" of payment for health care costs, however they may be incurred.[10] In the context of private limited health care plans in Utah, access to "arranged for" health care services is one product. *See also Klamath–Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1288–1290 (9th Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983); *De Modena v. Kaiser Found. Health Plan, Inc.,* 743 F.2d 1388, 1396 (9th Cir.1984). There is no tie—positive or negative—to a product other than access, and therefore, there can be no unlawful tying in violation of § 1 of the Sherman Act.

## Limited Health Plans, Limited Provider Panels, Freedom of Contract & Concerted Refusals to Deal

■ Buried beneath the blizzard of paper and the pleadings of all parties is a fundamental policy question: *may a limited health care plan appoint a limited number of service providers of a particular kind to its provider panel,* or, to avoid federal antitrust liability, must the plan include on its provider panel some or all differently credentialed health care providers who offer similar services—in effect, creating an "open" panel of providers. In particular, where IHC provider panels include M.D. ophthalmologists who offer non-surgical eye care (as well as surgical eye care), must they also include on their panels licensed optometrists who offer non-surgical eye care (but do not offer surgical eye care), in order to comply with the federal antitrust laws?

---

**10.** If employee benefits *administration* is the desired "product," in contrast to employee access to health care services, an employer may engage a benefits administrator who is not a limited health care plan or HMO governed by Utah Code Ann. §§ 31A–8–101 *et seq.* (2003), or simply purchase a health insurance indemnity policy covering a schedule of reimbursable health care costs.

Plaintiffs claim they must. The IHC Defendants and others claim they need not.

The current Insurance Code of the State of Utah expressly allows limited provider panels by empowering limited health plans to furnish health services "through providers which are under contract with" the plan. Utah Code Ann. § 31A–8–105(2) (2003). In contrast, the power of limited health plans to "offer to its enrollees, in addition to health care, insured indemnity benefits" is expressly restricted to "emergency care, out-of-area coverage, unusual or infrequently used health services ... and adoption benefits...." Utah Code Ann. § 31A–8–105(4).[11] The Utah statute authorizes but does not require limited health plans to make available the services of specified classes of health care providers, and it sets no minimum or maximum number of providers within any class with whom a plan must enter into contracts. A plan may "arrange for" the services of one eye care provider under contract, or five hundred eye care providers under five hundred contracts, or may choose not to offer enrollee access to eye care services at all. The same is true of the services of dentists, podiatrists, psychologists, naturopathic physicians, or "other health care providers." Utah Code Ann. § 31A–8–101(6)(a)(A), (D), (E), (H) & (L). Whether one or five hundred, a plan's provider contracts necessarily operate as an exclusion from the plan of any similar providers who do *not* have contracts, be they state-li-censed dentists, optometrists, ophthalmologists, or acupuncturists.

A plan's arrangements with its contracted panel providers may reflect "simply an exercise of its freedom to contract with whomever it chose in order to sustain itself in the marketplace. The general freedom of a single business to select its partners has been an established part of antitrust law since *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)." *Klamath–Lake Pharm. Ass'n,* 701 F.2d at 1292 (footnote omitted). In *Colgate,* the Supreme Court articulated the general rule respecting refusals to deal: "In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal." 250 U.S. at 307, 39 S.Ct. 465.

Plaintiffs assert that the IHC Defendants' eye care provider panels are purposefully anti-competitive to the extent that they exclude optometrists as a class and the Plaintiff optometrists in particular, and constitute an unlawful "group boycott" or "concerted refusal to deal" in violation of Sections 1 and 2 of the Sherman Anti-Trust Act. They further contend that state authorization of a limited health plan panel that includes ophthalmologists but does not include optometrists is in violation of the federal antitrust laws, and that such state authorization in no sense excuses

---

**11.** In this respect, private "managed care" limited health plans differ from traditional health care indemnity insurance or group health plans which provide "reimbursement for a portion of the costs incurred by subscribers with respect to outpatient treatment" or hospital care for a list of covered illnesses, disorders, injuries, and in some instances, routine preventative care, *Blue Shield of Virginia v. McCready,* 457 U.S. at 468, 102 S.Ct. 2540; providers are often selected by the subscriber from the larger market of health care providers. For example, Ms. McCready obtained and paid for psychotherapy services from her own psychologist and then sought reimbursement from her group health plan, which was refused for allegedly unlawful anticompetitive reasons. *Id.* at 468–70, 102 S.Ct. 2540.

non-compliance with the federal antitrust laws, which reign supreme.

The IHC Defendants respond that limiting plan services "to a panel of preferred providers is the essence of managed care," and that selective contracting is the most effective strategy that limited health care plans can use to contain health care costs. They assert that the omission of optometrists from its plan provider panels is the result of a longstanding practice of requiring most panel members to be M.D.s with IHC hospital privileges; that the designation of ophthalmologists rather than optometrists was an independent business decision having to do with the design of the limited health plan "product"; and that while some panel members objected to the adding of optometrists when such was being discussed some years ago,[12] IHC unilaterally decided to continue with the longstanding practice of paneling only ophthalmologists for both non-surgical and surgical eye care, independent of those objections. The composition of the IHC plans' provider panels thus does not represent a "group boycott" or "concerted" refusal to deal, and the limitation of eye care panel providers to many, but not all of the available ophthalmologists finds support in reasonable competitive business justifications.

IHC's "managed care" limited health plans were designed and are sold, for the most part, to employers of enrollees. As described above, the product sold is access to "arranged for" health care services through plans with limited provider panels, not just for eye care, but a broad spectrum of available services under each plan. If the prospective purchaser of the plan, usually the employer of an enrollee, was not interested in the product as offered, *viz.*, with no optometrists on the provider pan-

el, the purchaser could look elsewhere. Other competing plans in the "managed care" marketplace offer panels which include optometrists, with at least some of the Plaintiffs among them.

Often in antitrust cases involving alleged refusals to deal, the refusal itself is not the antitrust violation claimed to be actionable; the antitrust violation often consists of illegal attempts to monopolize, unlawful tying arrangements, price fixing, or the like. In this case, Plaintiffs allege the antitrust violation underlying the refusal of IHC plans to deal with optometrists to be a conspiracy between the IHC Defendants and IHC's panel ophthalmologists to monopolize the "sale of health care services for non-surgical and surgical eye care and in the utilization of surgical facilities for eye care," with anti-competitive effects that are at least six-fold: (1) eliminating competition between ophthalmologists and optometrists for the pool of IHC plan enrollees; (2) depriving IHC enrollees and subscribers of the economic benefits of competition between IHC panel ophthalmologists and "optometrists as a class" in providing non-surgical eye care services to enrollees, resulting in (3) increased costs of IHC limited health plans; (4) furthering IHC's use of its market power in the private health care financing market to increase its market power in the surgical facilities market; (5) "suppressing and eliminating competition" in the surgical facilities market; (6) "without reasonable competitive justification or benefit" to IHC enrollees, or pro-competitive effects that outweigh the anti-competitive effects of the refusal to deal. (Sec. Amd. Cmplt. at 32–38 ¶ 87(1)-(2).)

Plaintiffs are not in the business of marketing limited health care plans, just as

---

**12.** Having objected orally in times past, or in writing, each of the defendant ophthalmologists has filed an affidavit in this action disclaiming any "unlawful agreement to bar optometrists" from provider panels.

they are not in the business of making hospitals or surgical centers available for use by others, be they medical doctors or surgical eye care patients. The Plaintiff optometrists are not here as subscribers to or enrollees in any of defendant IHC's limited health care plans, and no "enrollee" or subscriber has joined or been joined in this action as a party plaintiff.

The services Plaintiffs offer are non-surgical eye care and, of course, hardware (*e.g.*, glasses, contact lenses) and related products. The Plaintiffs compete with other non-surgical eye care providers in the open public market for such services, including other optometrists who are not parties to this action, ophthalmologists who have been appointed to IHC plan provider panels, and ophthalmologists who have not.

They assert that because of their exclusion from the status *as panel providers* of the IHC-sponsored limited health plans, they cannot compete effectively with IHC's panel providers in selling their services to *the pool of IHC plan enrollees*, with a corollary loss of revenue, and that enrollees of such plans are denied the benefits of competition between non-surgical eye care services provided by the paneled ophthalmologists and the same or similar services provided by themselves, "arranged for" and paid for under the terms of the IHC plans, and that as a consequence, IHC's "managed care" products become more expensive to IHC's subscribers. (*See* Sec. Amd. Cmplt. at 37 ¶ 87(2).) They also allege that the IHC Defendants have ex-cluded optometrists from provider panels in furtherance of IHC's efforts to leverage its market power in the "managed care" health plan market to increase its market power in the hospital/surgical facilities market. (*Id.*)

How then do we define the relevant market in which Plaintiffs claim a legitimate interest, and in which competition has been unlawfully restricted by the defendants' conduct, resulting in "antitrust injury" to the Plaintiffs? Plaintiffs now insist that the relevant market for the purposes of their § 1 claims is the "commercial managed care health insurance market" in the State of Utah, and that IHC's market share in both the managed care and surgical facilities markets "gives IHC the power to control prices or exclude competition" in both of those markets.[13]

The market dominance that Plaintiffs point to is the very large presence of IHC in both the "managed care" health plan market and the hospital/surgical facilities markets. Plaintiffs, of course, are in neither market. They have no plan of their own, although many of the Plaintiffs serve on provider panels of other plans which compete with IHC plans, and which pay those Plaintiffs for services rendered to such competing plan enrollees. Plaintiffs are not hospital-privileged. They own no surgical facilities and offer no surgical services.

Plaintiffs argue that the consumers of eye care services—in particular, the enrollees of IHC plans—should have a wider

---

13. Plaintiffs' designation of the "managed care" health plan market as the relevant market for purposes of their § 1 group boycott/concerted refusal to deal claims stands in contrast to other cases identifying the health services market as relevant. *See, e.g., Griffiths v. Blue Cross and Blue Shield of Alabama*, 147 F.Supp.2d 1203, 1214 (N.D.Ala. 2001) ("the allegations of Plaintiffs' complaint at least implicitly acknowledge that the rele-vant product market includes not only the services of chiropractors, but also the oft-referenced 'comparable' or 'similar' services afforded by other types of competing health care providers").

Plaintiffs point to the "market for the utilization of surgical facilities on the Wasatch Front" is the relevant market for purposes of Plaintiffs' § 2 claims.

choice, which would include the services of Plaintiffs, and thus the alleged benefits of competition—ostensibly lower prices for such services or product resulting in plans less expensive to subscribers—would be made available to all. Carried to its ultimate conclusion, the Plaintiffs' argument leads to open panels, which would allow plenary enrollee choice within the context of the available health care provider market and geographic location.[14]

The question of choice is a fascinating question, particularly when a consumer is purchasing a product or a service, or an employer is purchasing a package of services for the benefit of employees.

In a sense, when a "consumer" becomes an "enrollee" in a limited benefit plan purchased by an employer, usually by becoming an employee or remaining an employee of that employer, he or she may choose to obtain future health care services from one or another of the members of the plan's provider panel, that is, if he or she wants the plan to pay for such services. Or the enrollee may choose a provider outside of the panel, if he or she is willing to absorb most or all of the costs of services thus incurred.

That is a different level of choice than the choice an employer has in the selection of a health plan from among the various vendors of health care plans.

Those who sell qualified limited health care plans are free to offer their product to all who are willing to buy. They are not restricted or restrained. Indeed many of the Plaintiffs are on provider panels of plans which compete with IHC plans and have patients under such plans seeking them out for service, and the Plaintiffs are paid pursuant to the provisions of such plans. No limited health care plan has

joined this lawsuit as a party Plaintiff, complaining about diminished competition in the health care plan business or asserting an attempted monopolization thereof by the IHC Defendants.

What then is "the relevant market," the restriction of which may be vulnerable to antitrust liability?

It has to be, if any, the marketing of health care plans. It is in that market one must seek solace, if any, under antitrust laws. It is that market which has open or restricted panels in varying combinations, sold in competition with other health care plans.

The alleged attempted monopoly by the IHC Defendants is said to amount to a "boycott" unlawful in nature based upon an agreement not to include optometrists on the panels of IHC plans, and rejecting their requests for inclusion, and thus restricting competition among panel providers for services to the pool of enrollees. While it is true that the panels are limited to some ophthalmologists, (indeed, not all ophthalmologists), there is no binding restriction on the choice that enrollees may make among the paneled ophthalmologists for eye care services of a non-surgical or a surgical nature. There is no prohibition against an enrollee going beyond the panel if he or she is willing to forego payment by the plan to his selected service provider. Each paneled ophthalmologist is competing for both surgical and non-surgical eye care patients with every other ophthalmologist on the panel, and with the Plaintiff optometrists, as well as ophthalmologists not on the panels and optometrists who are not parties to this lawsuit.

If the relevant market is the "managed care" health plan market, the "restrictive

---

**14.** Yet Plaintiffs do not totally denigrate the economic virtues and competitive value of limited panels. The relief they seek is to be made members of defendant IHC's limited provider panels, not to open the panels to all.

practice of which plaintiffs complain is, at most, an indirect restraint of trade. Plaintiffs do not allege that defendants' conduct interfered directly with plaintiffs' access to consumers, or that they were unable to practice their profession because of defendants' activities." *Johnson v. Blue Cross/Blue Shield of New Mexico,* 677 F.Supp. 1112, 1119 (D.N.M.1987).[15]

What Plaintiffs are really complaining about is that they would like to be part of what they characterize as an "attempted monopoly" which restrains trade in the relevant market; they want to make that which they say is now too big and dominant that much bigger by adding themselves to the provider panels as optometrists. In effect, they now complain that they have been deprived "of the benefits of increased concentration." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The millions of dollars in damages that Plaintiffs now seek "are designed to provide them with the profits they would have realized had competition been reduced" in the Wasatch Front "managed care" health plan market by their own inclusion on IHC's provider panels, *id.*—their "piece of the action" had they been able to join IHC's purportedly illicit combination, thereby enhancing IHC's position in the Wasatch Front managed care plan market at the expense of non-IHC plans and eye care providers not on IHC panels.[16]

Such is a novel argument, perhaps ingenious. Would such mandated enlargement of panel membership then still be in violation of the federal antitrust laws as complained, or even more so? While it would expand panel choices for IHC enrollees, it does nothing to diminish IHC's alleged dominance in the private "managed care" health plan market or forestall any anticompetitive increase in IHC's market power in the hospital/surgical facilities market—the predicate antitrust law violation pleaded as supporting the Plaintiffs' claims.[17] We must keep in mind that "[t]he antitrust laws ... were enacted for 'the protection of *competition,* not *competitors,*'" and that "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended

15. This case differs from cases such as *Blue Shield of Virginia v. McCready,* in which the financing under the group health plans by its own terms was made available to the entire health care provider marketplace, but for the defendant's subsequent "change in the terms of the plan to link reimbursement to a subscriber's choice of one group of psychotherapists over another." 457 U.S. at 480 n. 17, 102 S.Ct. 2540. In *McCready,* plaintiff's claim was "premised on a concerted refusal to reimburse under a plan that ... as a matter of contract construction and state law permitted reimbursement for the services of psychologists without any significant variation in the structure of the contractual relationship between her employer and Blue Shield." *Id.* at 480, 102 S.Ct. 2540; *see also id.* at 468 n. 2, 102 S.Ct. 2540.

16. Plaintiffs do not pray for an injunction requiring the IHC Defendants to open IHC panels to *all* licensed optometrists, or for that matter, to all eye care providers—optometrists and ophthalmologists—not already appointed to IHC panels. Rather, they seek an order compelling IHC "to approve and include *each plaintiff optometrist* as a duly authorized provider ... for all enrollee/patients under each and every IHC private health care plan and IHC-affiliated plan that now exists and may be created in the future." (Sec. Amd. Cmplt. at 52–53 [Prayer for Relief] ¶ 8 (emphasis added).)

17. Plaintiffs' pleadings seek injunctive relief by which the IHC Defendants would be "permanently enjoined and restrained from the commission of the acts in violation of §§ 1 and 2 of the Sherman Act as alleged in ¶¶ 87(1)-(7)" of the Second Amended Complaint, (Sec. Amd. Cmplt. at 52 [Prayer for Relief] ¶ 7), but lack the requisite standing to challenge the IHC Defendants' alleged misconduct in the hospital/surgical facilities market.

to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp.,* 429 U.S. at 488, 489, 97 S.Ct. 690 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (emphasis in original)). The "adverse impact must be on *competition,* not on any individual competitor or on plaintiff's business." *Reazin,* 899 F.2d at 960 (emphasis in original & citations omitted). "Additionally, 'we must bear in mind that the purpose of the antitrust laws is the promotion of consumer welfare.... [W]e consider [defendant's] refusal to deal in light of its effect on consumers, not on competitors.'" *Id.* (quoting *Westman Comm'n Co. v. Hobart Int'l, Inc.,* 796 F.2d 1216, 1220 (10th Cir. 1986), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988)).

The Sherman Act does not guarantee the Plaintiffs a share the economic benefit of IHC's market power in the "managed care" health plan market, or the right to join in IHC's exercise of its market power for their own financial gain. Nor have the Plaintiffs cited to any authority construing the federal antitrust laws to mandate "open" provider panels in the private "managed care" limited health plan industry, even where one vendor may be shown to have "substantial" market power, *viz.,* "monopoly power." *Reazin,* 899 F.2d at 966–67.

The "pool" of IHC limited health plan enrollees is not a separate relevant market from which Plaintiffs have wrongfully been excluded by a "concerted refusal to deal," or by the exercise of IHC's alleged "power to control prices or exclude competition" in both the "managed care" health plan and surgical facilities markets. Plaintiffs have come forward with no significant probative evidence establishing that the IHC Defen-

dants have exercised such power in the relevant "managed care" limited health plan market in a way that has excluded competition by other limited health plans to the detriment of competition in that market, or in a way that has increased prices of plan benefits to the detriment of health care consumers and plan subscribers. Though they may indeed suffer as *competitors* of IHC panel providers in seeking the business of IHC enrollees,[18] the Plaintiffs have shown no discrete "antitrust injury" to themselves flowing from any adverse impact upon *competition* resulting from the defendants' alleged misconduct.

### Limited Health Plans & Public Policy

The evolving nature of the system of delivery of health services to consumers presents a complex issue of public policy, ever-present in today's society. In the opinion of this Judge, the existing system is a mess. Millions of Americans are left with little or no health care coverage, public or private, in a setting in which health care needs continue to grow and health care costs continue to escalate. Those fortunate enough to obtain some health care coverage must grapple with the cost burden of increasing "deductibles," rising premiums, and diminished services due in part to the diversion of public resources to other "priorities."

The question of the very existence of "managed care" limited health plans is likewise a matter of public policy. Such plans are a creature of statute, regulated by the State of Utah. The question of limited or "open" provider panels within the context of limited health plans is also a matter of public policy, and may be addressed by the same deliberative body that

---

**18.** It appears that Plaintiffs' patients already include approximately 10 of the IHC limited health plan enrollees.

brought limited health plans into existence in the first place.

At this point, the Utah Legislature has chosen to empower limited health plans to define their available services and to select their participating providers through their own finite set of contractual "arrangements." At the same time, the State has expressly restricted the ability of such plans to offer more expansive indemnity reimbursement for health care costs incurred by enrollees seeking health care services in the market of providers outside of the enrollee's plan.[19] The statute thus contemplates that the health care services made available to consumers through limited health plans will draw upon a pool of health care providers that is smaller than the entire provider market, necessarily excluding some providers or classes of providers who have no contractual "arrangement" with the plan.

If upon reflection a different choice should be made, and "open" provider panels are to be preferred as a matter of public policy, then it is for those who authorize, empower and regulate such plans to make that different choice.

### Conclusion

The court has heard arguments on the pending motions, and has been well supplied with endless paper. The court has heard the proffered testimony of Rule 702 experts on all sides in this matter within the context of a Rule 16 Pretrial Conference, ostensibly the testimony to be offered if the matter went to trial. That proffered testimony has informed the court's consideration of the pending dispositive motions.

If the attempt is to monopolize surgical health care facilities, Plaintiffs, of course,

don't use them. If the attempt is to monopolize health care plans, Plaintiffs don't sell them.

If it is an attempt to monopolize the eye care services provided by ophthalmologists and optometrists, the IHC Defendants do not provide such services. Those who do, compete, at the least, with other panel providers and other ophthalmologists or optometrists who are not panel members or who are affiliated with other plans.

While, as a matter of social policy, it may be wise to have open panels, as now practiced by Medicare, there is nothing in the antitrust laws to proscribe a vendor of plans to have as many or as few providers, as the plan is designed to have, and to test the acceptance of its plan in the market. Perhaps the IHC plans would have wider acceptance if the eye care services panel were enlarged to include optometrists, but that is a business decision as to the design of the plan being offered in the marketplace of plans. The creator of a plan sold in the "managed care" plan market—usually to employers—for the benefit of enrollees—usually employees—may, and indeed must design its plan so as to compete with other plans.

An open panel may be featured. A limited panel may be featured.

Each may include all the other various features of a limited health care plan, or not.

The "managed care" health plan market has major players and lesser players, but plan suppliers do compete.

Plaintiffs would like to be a member of panels available to IHC enrollees. They would then be in a position to offer services and compete for use by enrollees and

---

**19.** With very narrow exceptions, a limited health plan cannot offer benefits that indemnify enrollees for the cost of services rendered by non-participating providers, in contrast to health care plans such as the one at issue in *Hahn v. Oregon Physicians' Service,* 868 F.2d 1022 (9th Cir.1988).

reimbursement by the IHC plan. That may well be a future IHC business decision. It is not the current business decision in the design of existing IHC-sponsored plans.

Limited health plans assert it can negotiate fees for services with panel members by limiting panel members because panel members would have an increased volume of clientele, and would service them at a reduced negotiated price to the overall benefit of all concerned. At least, that is the story.

The historic facts are essentially without dispute.

We have all IHC plan documents in the record. We have evidence in the record of IHC's relation to affiliated plans. We have evidence in the record of IHC's large, if not dominant, position in the market for health care plans.[20]

We have exemplars of plan provider agreements periodically entered into with various providers, including ophthalmologists. And we have the consideration by IHC of possibly modifying prior policy and adding optometrists to the panels, and the historic objection of some ophthalmologists, and the business decision to continue offering the plans as previously designed, and as they existed without the optometrists.

Much of the factual material in the record is deemed by the parties to be "confidential" and much of it has been filed under seal, as have many of the memoranda and statements of fact that make specific reference to the factual material.

From the record currently before us, and viewing the record in the light most favorable to plaintiffs:

Is there an unlawful boycott or concerted refusal to deal?

There is not, and no reasonable jury could so find.

Is there an actionable violation of section 1 or section 2 of the Sherman Anti–Trust Act?

There is not, and no reasonable jury could so find.

The extensive record to which this court refers, provides the footing for the court to deal with this matter at this stage of the litigation, and to do so without trial.

Therefore,

**IT IS ORDERED** that for the reasons explained above,

The motions of the IHC Defendants for summary judgment on Plaintiffs' tying claims (dkt. no. 717) and Plaintiffs' Section 1 and Section 2 claims (dkt.nos.719, 723) are GRANTED;

Defendant Miller's Motion for Summary Judgment (dkt. no. 882) is GRANTED;

Defendant Brodstein's Motion for Summary Judgment (dkt. no. 715) is GRANTED;

The motions to exclude or strike the opinions and testimony of various expert witnesses proffered in this case (dkt.nos.732, 733, 743, 746, 788, 818, 822, 825, 831) are DENIED;

---

**20.** We also have evidence in the record of the large, if not dominant, status of IHC as a vendor of hospital and surgical facilities. Of course, there are stand-alone eye centers, unaffiliated with IHC, and there are other hospitals and hospital chains which compete with IHC hospitals and surgical facilities. Plaintiff optometrists do not use hospitals and surgical centers in providing non-surgical eye care to their patients. They argue that IHC hospitals and surgical centers are trying to monopolize use by a provision in the provider contract asking that panel members (who already have hospital privileges) to use the hospital and eye centers for their patients. That alleged violation is simply too remote from the injury alleged by Plaintiffs to make that claim justiciable in this action.

The motions to supplement the record with defendants' expert reports (dkt. no. 775), to file Hoffman's second damages study (dkt. no. 907) and for leave to join an opposition memorandum (dkt. no. 912) are GRANTED;

The remaining ancillary motions (dkt. nos.406, 599, 721, 770, 787, 829, 835, 839, 889) are DENIED AS MOOT.

Counsel for various defendants are to prepare and submit forms of Judgment in accordance with this Order, and to do so within 10 days.