**F I L E D**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAMES M. ABRAHAM, ADVANTAGE
EYE CARE; TERRY H. BERNER;
BERNER EYE CLINIC;  BLAINE F.
BIRD; ROBERT S. BRIGGS; PARK
CITY VISION CENTER; TRAER G.
CAYWOOD; BILL G. CODNER; OREM
EYE CLINIC; CRAIG J. CUTLER;
WASATCH VISION CLINIC; DANE F.
DANSIE; LANNY F. DUCLOS;
LINCOLN J. DYGERT; BRADLEY V.
FELLOWS; MATHEW G. FINDLAY;
MURRAY VISION CENTER; KEVIN J.
FROMM; OPTOMETRIC PHYSICIANS;
JAMES L. FROST; OPTICAL
ASSOCIATES; PAUL D. GELLER;
APPLE CONTACT LENS CENTER; ROY
R. GIBSON; ROBERT F. GRAY; DALE
F. HARDY; RICHARD W. HART;
KENNETH H. HOOTON; RICH
HEMPHERYS; FAMILY VISION CARE;
JODIE JOHNSON; RIVERTON FAMILY
EYE CARE; MICHAEL JUDKINS;
ROBERT W. KELLER; TODD E.
KIMBALL; SUGARHOUSE VISION
CLINIC; SHAUN D. LARSEN; MOBILE
EYE CARE OF UTAH; TODD J. LEWIS;
KEITH W. LINFORD; DAVID R.
MASIHDAS, doing business as Utah Eye
Associates; ROLAND K. MONSON; EYE
CLINIC AND CONTACT LENS CENTER
OF UTAH VALLEY; CHELLE NICKLE;
OAKRIDGE OPTOMETRY; KERRY A.
OKELBERRY; HARALD E. OLAFSSON;
DANIEL W. PACE; PAUL A. PAXMAN;

No. 05-4043

MOUNTAIN VIEW EYE CARE; SCOTT D. PETERSON; WALTER G. PETERSON; GREG M. PICKETT; PHILLIP A. PLOTHOW; RUSSELL W. PURDY; DAVIS EYECARE CENTER; ALAN T. REES; JAMES D. SARGENT; JEFFREY H. SEEHOLZER; SEEHOLZER VISION CENTER; FRANK A. SIDDOWAY; GARY C. SLAUGH; OGDEN VISION CENTER; DAVID A. SMITH; SOUTH VALLEY EYECARE CENTER; DOUGLAS R. SMITH; BOUNTIFUL VISION PLAZA; ROBERT M. WILKES; BOUNTIFUL EYE CARE; ROBERT P. WOOLDRIDGE; STANDARD OPTICAL; UTAH COUNTY OPTOMETRIC PHYSICIANS,

        Plaintiffs - Appellants,

v.

INTERMOUNTAIN HEALTH CARE INC.; IHC HEALTH SERVICES, INC.; IHC HEALTH PLANS, INC.; IHC BENEFIT ASSURANCE COMPANY, INC.; COREY A. MILLER; DAVID E. BRODSTEIN; COUNTRY HILLS EYE CENTER,

        Defendants - Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D. Ct. No. 2:01-CV-919-J)**

---

Daniel L. Berman, Berman & Savage, Salt Lake City, Utah (Peggy A. Tomsic,

Tomsic Law Firm, LLC, Salt Lake City, Utah, with him on the briefs), appearing for Appellant.

Richard W. Casey, Howrey, L.L.P., Salt Lake City, Utah (Gary F. Bendinger and John H. Bogart, Howrey, L.L.P., Salt Lake City, Utah; James S. Jardine and John Mackay, Ray, Quinney & Nebeker, Salt Lake City, Utah; Thomas R. Karrenberg and Nathan B. Wilcox, Anderson & Karrenberg; and William G. Kopit and Patricia Wagner, Epstein, Becker & Green, P.C., Washington, DC, with him on the brief) appearing for Appellees.

---

Before **TACHA**, Chief Circuit Judge, **PORFILIO**, Circuit Judge, and **JOHNSON**, District Judge.[*]

---

**TACHA**, Chief Circuit Judge.

---

This appeal is the result of certain Utah optometrists' decade-long effort to become panel providers for the largest managed health care company in the state. In 2001, the optometrists ultimately filed suit against Intermountain Health Care, Inc. ("IHC") and others, alleging that IHC's exclusion of optometrists from its network of providers violates §§ 1 and 2 of the Sherman Act. The District Court granted summary judgment in favor of the Defendants on all claims. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

A.    The Parties and Players

---

[*] The Honorable William P. Johnson, District Judge of the United States District Court for the District of New Mexico, sitting by designation.

*1. The Plaintiffs*

The Plaintiffs are forty-nine optometrists who practice along Utah's Wasatch Front[1] and their affiliated professional organizations, as well as Standard Optical Company, an eye clinic on the Wasatch Front that employs optometrists. Optometrists sell optical hardware, such as glasses and contact lenses, and have been permitted under Utah law to perform the full scope of non-surgical eye care ("NSEC") since 1991. All optometrists who are parties to this suit are therapeutic optometrists, which means they are authorized to prescribe prescription drugs in addition to performing NSEC and selling hardware.

*2. The Defendants*

We begin with IHC, the largest managed care company in Utah. IHC began as an nonprofit association of hospitals in 1975. In the mid-1980s IHC vertically integrated its hospitals and began to offer prepaid health services from IHC facilities and physicians through managed care organizations. IHC's health service products—also called managed care plans—are provided through IHC's wholly-owned subsidiary, IHC Health Plans, Inc. In the mid-1990s, IHC added a physicians' division and formed IHC Health Services, Inc. That entity operates health care facilities and directly employs physicians and other health care

---

[1]The Wasatch Front refers to Salt Lake, Davis, Weber, Cache, Utah, and western Summit counties.

providers. IHC and its affiliates now own and operate nineteen acute care hospitals and six surgical centers in Utah. Nine of these hospitals and five of these surgical centers are located on the Wasatch Front.

The Defendants also include two ophthalmologists—Corey A. Miller, M.D. and David A. Brodstein, M.D.—and their respective professional corporations. Like optometrists, ophthalmologists sell optical hardware and perform the full scope of NSEC. They therefore compete with optometrists for the sale of these goods and services. Unlike optometrists, however, ophthalmologists are licensed physicians and are authorized in Utah to perform surgical eye care ("SEC") in addition to NSEC. Accordingly, ophthalmologists frequently have staff privileges at hospitals, which enables them to use the hospital to perform eye surgery.[2]

Though not a party to this action, Eye Network of Utah ("ENU") figures prominently in this case. ENU is a network of vision care providers; its membership comprises exclusively ophthalmologists under contract with an IHC managed care plan. Dr. Miller and Dr. Brodstein were managers of ENU during the period relevant to this appeal. The members of ENU, as well as all of IHC's panel ophthalmologists, are horizontally positioned competitors with respect to

_____

[2]For the sake of clarity, we will collectively refer to the IHC-affiliated entities as "IHC." We will refer to Drs. Miller and Brodstein and their professional corporations as "defendant opthalmologists." We will refer to the collective group of defendants—IHC, IHC Health Plans, Inc., and IHC Health Services, Inc., and the defendant ophthalmologists—as "Defendants."

each other (in the provision of SEC and NSEC and in the sale of optical hardware) and with respect to optometrists (in the provision of NSEC and the sale of optical hardware).

B.    Background Facts

IHC administers four managed care plans that furnish health care services, including SEC and NSEC, to an enrollee in exchange for periodic prepaid premiums.  The plans seek to limit costs (and therefore premiums) by: (1) designating the individual health care providers ("panel providers") from whom enrollees may seek treatment; and (2) managing access to and the type of care enrollees may obtain.  IHC then reimburses panel providers for services provided to enrollees.  Because panel providers accept lower payments for their services to IHC enrollees in exchange for increased patient volumes directed to them as a panel provider, costs may decline and premiums may decrease when provider panels become smaller and more exclusive.  Therefore, IHC limits the number of health care providers with whom it contracts.[3]   These contracts are governed by written agreements, and all IHC's panel providers—whether physicians like ophthalmologists or so-called "ancillary providers" like optometrists—sign the same agreement.

---

[3]Utah law explicitly permits this practice.  *See* Utah Code Ann. § 31A-8-105(2) (stating that "organizations may . . . furnish health care through providers which are under contract with the organization").

IHC's presence in the market for managed care—that is, the market for managed care plans—is significant, estimated by some to consist of sixty percent of total managed care plan enrollees on the Wasatch Front. Although IHC's enrollees may patronize a health care provider who is not an IHC panel provider, plan benefits will generally not be paid when the enrollee does so. As such, IHC's panel providers only theoretically compete with non-panel providers because the practicalities of life dissuade most IHC enrollees from obtaining health services from non-panel providers. *See Abraham v. Intermountain Health Care, Inc.*, 394 F. Supp. 2d 1312, 1318 (D. Utah 2005).

Besides IHC's presence in the market for managed care plans, it also has a significant presence in the market for hospital and surgical facilities on the Wasatch Front. It controls approximately 51% to 55% of that market. Although IHC has employed some physicians directly, for the most part health care is provided only through its managed care subsidiaries.

With one exception, all of IHC's panel providers of eye care on the Wasatch Front are ophthalmologists. In contrast, all competing managed care companies on the Wasatch Front have both ophthalmologists and optometrists on the list of available providers of NSEC. Indeed, all the optometrists in this case serve on IHC's competitors' panels. Not surprisingly, then, optometrists on the Wasatch Front have for more than a decade entreated IHC to list them as

providers on its managed care plans. In fact, in 1995 there were several indications that IHC intended to include optometrists on its provider panels, as they typically charge approximately twenty percent less for NSEC than do ophthalmologists. Ultimately, however, no optometrists were paneled. IHC's director of provider relations explained that whenever IHC tries to add optometrists to its provider panels, the ophthalmologists "write all kinds of letters and [make] phone calls and raise such a stink" that IHC decides not to do it each time it is proposed.

The crux of the Plaintiffs' claims is the existence of an agreement between IHC and its panel ophthalmologists designed to preserve for ophthalmologists the exclusive ability to provide NSEC to an estimated sixty percent of the region's managed care enrollees while simultaneously increasing IHC's dominance in the market for the provision of hospital and surgical facilities. More specifically, the Plaintiffs claim that in exchange for IHC's agreement not to panel optometrists, IHC's panel ophthalmologists agreed to refer their patients to IHC hospitals and surgical facilities—as opposed to facilities owned and operated by IHC's competitors—when those patients needed SEC. Needless to say, IHC and the defendant ophthalmologists deny the existence of any such *quid pro quo*. More facts will come as needed.

C.   Procedural History

The Plaintiffs filed suit against the Defendants in November 2001, alleging violations of §§ 1 and 2 of the Sherman Act, *see* 15 U.S.C. §§ 1, 2. They sought damages under § 4 of the Clayton Act, *see* 15 U.S.C. § 15(a),[4] as well as injunctive relief under § 16 of the Clayton Act, *see* 15 U.S.C. § 26.[5] All of the Plaintiffs' claims are based on the same general conduct. As explained above, they first allege that IHC and the defendant ophthalmologists conspired to exclude optometrists as a class from IHC's provider panels—conduct that, according to the Plaintiffs, constitutes an illegal horizontal group boycott in violation of § 1. They also allege that IHC unlawfully tied the sale of its managed care plans to the provision of SEC and NSEC in violation of § 1. Finally, the Plaintiffs allege IHC and the defendant ophthalmologists conspired and attempted to monopolize the market for surgical facilities in violation of § 2.

The District Court granted summary judgment in favor of all Defendants. With regard to the group boycott claim, the court held that the Plaintiffs failed to establish the existence of a conspiracy and that they had shown no "discrete

---

[4]Section 4 provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

[5]Section 16 provides that "[a]ny person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . under the same conditions and principles . . . [usually employed by] courts of equity." 15 U.S.C. § 26.

'antitrust injury' to themselves flowing from any adverse impact upon competition resulting from the defendants' alleged misconduct." *Abraham*, 394 F. Supp. 2d at 1326 (emphasis omitted). As to the tying claim, the District Court held that the Plaintiffs failed to establish that two separate products existed such that the sale of one could be tied to the sale of the other. More specifically, the District Court concluded that IHC markets only a single product—namely, "access to health care"—and that the Plaintiffs' attempt to carve that product into its individual service components (e.g., SEC and NSEC) was unavailing. *See id.* at 1319–20. Finally, with regard to the monopolization claims, the District Court concluded that the Plaintiffs lacked standing because they neither competed nor sought to compete in the surgical facilities market and that any injury they suffered was therefore only an indirect result of the allegedly anticompetitive conduct on the part of the Defendants. *See id.* at 1318.

## II. SECTION 1 CLAIMS

A. <u>Group Boycott</u>

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. A conspiracy involves "two or more entities that previously pursued their own interests separately . . . combining to act as one for their common benefit."

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). When two formerly separate entities combine for their common benefit, their activity is "fraught with anti-competitive risk" because it "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Id.* at 768–69. On the other hand, "unilateral conduct, regardless of its anti-competitive effects, is not prohibited" by § 1 of the Sherman Act. *Motive Parts Warehouse v. Facet Enter.*, 774 F.2d 380, 386 (10th Cir. 1985). It is therefore critical to distinguish between unilateral and concerted action in proving a violation of § 1.

The heart of the Plaintiffs' § 1 claim is that IHC, at the behest of several of its panel ophthalmologists—including Drs. Miller and Brodstein—unlawfully excluded optometrists from its provider panels, and that this exclusion injured both competition, generally, and the Plaintiffs, specifically. Of course, if IHC acted independently in excluding optometrists, IHC would not be liable under § 1. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer . . . generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Such is the case "[e]ven where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have." *Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986). There is also

no dispute that if panel ophthalmologists conspired with each other and then with IHC to restrain trade, then such conduct is actionable under § 1. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir. 1995) (hospital and medical staff are separate legal entities capable of conspiring with each other); *Cooper v. Forsyth County Hosp. Auth., Inc.*, 789 F.2d 278, 282 (4th Cir. 1986) (Motz, J., concurring) ("Section 1 of the Sherman Act clearly prohibits members of a medical-dental staff from agreeing with one another to coerce a hospital's trustees to deny privileges to members of a competing profession for the purpose of furthering their economic self-interest."). In this way, "[l]iability will only attach to *agreements* designed unreasonably to restrain trade." *Todorov*, 921 F.2d at 1455. The question before us is whether there is sufficient evidence of such an agreement between IHC and its panel ophthalmologists to survive summary judgment.

Although the traditional summary judgment standard applies to antitrust cases, the analysis is altered somewhat when—as is the situation here—the plaintiff relies solely on circumstantial evidence to prove concerted action. *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998). In that case, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "[C]onduct as consistent with permissible competition as with illegal

conspiracy does not, standing alone, support an inference of antitrust conspiracy."

*Id.* Accordingly, to survive summary judgment, a plaintiff must present "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto*, 465 U.S. at 764); *Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 963 (10th Cir. 1990). That is, the antitrust plaintiff must present evidence that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764 (quotation omitted).

As the Third Circuit has explained:

The Supreme Court's concerns about permitting the inference of a conspiracy from ambiguous circumstantial evidence in the antitrust context stem from its conclusion that mistakes by an overzealous judiciary would be "especially costly . . . chill[ing] the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594; *Monsanto*, 465 U.S. at 763; *Big Apple BMW*, 974 F.2d [1358,] 1363 ("Care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not infringe upon defendant's freedom, so long as it acts independently, to refuse to deal.") (citing *Colgate & Co.*, 250 U.S. 300 (1919)). For this reason, the plausibility of an antitrust plaintiff's claim is important. "[I]f the factual context renders [the plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[a plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587 (citations omitted). Relatedly, in evaluating whether a genuine issue for trial exists, the antitrust defendants' economic motive is highly relevant. "[I]f[ the defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id*. at 596. Moreover, even with a plausible motive to conspire, ambiguous

-13-

conduct will not create a triable issue of fact with respect to the existence of a conspiracy. *See id*. at 597 n.21.

*Rossi*, 156 F.3d at 466.

To establish a conspiracy between IHC and the defendant ophthalmologists, the Plaintiffs in this case make the following allegations in light of the undisputed facts:

Ophthalmologists have a long history of trying to limit competition between themselves and independent optometrists. This tension increased in 1991, when Utah passed new legislation authorizing optometrists to engage in the full scope of NSEC. The only group to oppose the legislation was the Utah Ophthalmology Society ("UOS"); Dr. Miller was the chairman of UOS's legislative committee at that time.

Due in part to the 1991 legislation, in 1995 IHC began studying whether to add optometrists to its provider panels. Drs. Miller and Brodstein—both of whom were already IHC providers—worked vigorously with each other and with other panel ophthalmologists to discourage IHC from paneling optometrists. Indeed, the record is replete with evidence of their efforts, which the ophthalmologists felt were necessary in order to retain their share of NSEC patients and optical hardware purchasers.

Of course, a conspiracy among the ophthalmologists alone could not effectuate their plan to horde the provision of NSEC and optical hardware.

-14-

Paneling decisions at IHC are made by IHC's Preferred Provider Strategic Committee—no members of which are ophthalmologists. Therefore, the ophthalmologists had to devise some way to convince IHC not to panel their competitors. To establish this indispensable part of the alleged conspiracy, the Plaintiffs emphasize that ophthalmologists had repeated discussions with IHC urging it to panel only ophthalmologists. For example, in November 1995, Todd Kimball, one of the plaintiff optometrists in this case, met with IHC to discuss the possibility of paneling optometrists. Several ophthalmologists were also in attendance, and they were openly hostile to Dr. Kimball. Two months later, in January 1996, Dr. Brodstein wrote a letter on behalf of ENU to IHC. The letter noted IHC's interest in paneling optometrists but went on to explain that in ENU's view an ophthalmologist-led network of providers that only included optometrists insofar as they were employed by and acted under the supervision of ophthalmologists was "essential to maintain the high quality of care provided by IHC."[6] In other words, it did not want independent optometrists on IHC's panels.

The ophthalmologists were successful; independent optometrists were not paneled. C.D. Richards, the Medical Director for IHC's Health Plans, Inc., explained to Dr. Kimball that the decision was made because "[t]he physicians do

_____

[6]ENU's internal memoranda, however, reveal less concern over the quality of care than concern about the possibility that independent optometrists might dilute the volume of business conducted by the ophthalmologists.

not want you on the panel at this time."  A memo between Mr. Richards and

another employee further elucidates IHC's decision:

> POLITICS SHOULD NOT CONTROL PANEL DECISION: There
> are many providers who do not get added to our panels because of
> the politics associated with hospitals and provider relationships.  A
> good example is optometrists.  Our members want to see them; they
> do not create any anti-selection; they are cost effective; and yet they
> are not added because the ophthalmologists at the hospitals don't
> want the competition.

At first blush, it might appear as though IHC and its panel ophthalmologists

acted in concert to exclude optometrists from IHC's provider panels—thereby

establishing that element of a § 1 claim.  Indeed, it is clear that IHC excluded

optometrists because of the actions of its panel ophthalmologists.  But simply

because IHC acted in response to ophthalmologists' complaints is not enough to

establish the concerted action requirement.  To the contrary, it is well-established

in antitrust cases that a manufacturer's exclusion of a buyer-distributor in

response to another buyer-distributor's complaints is insufficient as a matter of

law to establish conspiracy, *see Monsanto*, 465 U.S. at 763; accordingly, that IHC

chose not to panel optometrists because its ophthalmologists lobbied IHC for that

decision does not indicate that IHC and the ophthalmologists acted in concert

within the meaning of § 1.  The Supreme Court explained the rationale behind this

rule in *Monsanto*:

> Permitting an agreement to be inferred merely from the
> existence of complaints, or even from the fact that

-16-

termination came about "in response to" complaints, could deter or penalize perfectly legitimate conduct. As Monsanto points out, complaints about price-cutters are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals. Such complaints, particularly where the manufacturer has imposed a costly set of nonprice restrictions, arise in the normal course of business and do not indicate illegal concerted action. Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market. In sum, to permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute.

465 U.S. at 763–64 (quotation marks, citations, and alteration omitted).

Accordingly, the Plaintiffs must present additional evidence—evidence that tends to exclude the possibility that IHC was acting independently and not pursuant to an agreement with the ophthalmologists. To this end, the Plaintiffs assert that optometrists are a lower-cost alternative to ophthalmologists when it comes to NSEC because optometrists generally charge twenty percent less than ophthalmologists for the same NSEC and, according to a 1999 study conducted by IHC, IHC might save $300,000 to $400,000 per year on the provision of NSEC if it added optometrists to its panels. Specifically, the study noted that industry

-17-

experts estimate that fifty percent of routine eye exams are performed by optometrists; that IHC's panel ophthalmologists employ optometrists to perform NSEC for them; and that IHC pays ophthalmologists (for services performed by their employee-optometrists) at a higher rate than it would have to pay optometrists for the same service if the optometrists were directly included on the provider panel. Accordingly, the study recommended that IHC list optometrists on its provider panels if they were willing to accept reimbursement at a rate twenty percent less than the rate IHC pays to ophthalmologists.

In addition, the Plaintiffs contend that IHC had a motive to conspire with the panel ophthalmologists. IHC, as a vertically integrated health care system, seeks to maximize the use of its hospitals and surgical facilities. The Plaintiffs contend that the panel ophthalmologists were able to coerce IHC to exclude optometrists from its provider panels by promising that they (the ophthalmologists) would use IHC's hospital and surgical facilities to serve a substantial portion of their discretionary patients (i.e., those patients who are not IHC enrollees). In this way, both IHC and the panel ophthalmologists would benefit: IHC would profit by increasing the utilization of (and, accordingly, payment for) its facilities, and the ophthalmologists would profit by preventing lower-cost optometrists from competing with them for NSEC.

There is no direct evidence of such collusion; IHC's provider agreement

does not limit where a panel provider refers his or her non-IHC patients.

Nevertheless, the Plaintiffs argue that such *quid pro quo* is implicit in the

following paragraph of the provider agreement:

> Termination in Connection with Reappointment. Provider
> understands and agrees that HPI or an Affiliated Managed Care Plan
> may terminate Provider from participation with its Members at the
> time of or in connection with the recredentialing/reappointment
> process. Such termination may be based on (i) business or
> competitive reasons relating to HPI's or any Affiliated Managed Care
> Plans' business, (ii) Provider's adherence to efficient managed care
> principles and practices, (iii) *utilization of IHC related providers and
> facilities*, (iv) affiliation with competing organizations, or (v) other
> reasons, whether specified in this Agreement or not.

(emphasis added). Further, the record reveals that panel ophthalmologists, all of

whom have hospital privileges at regional hospitals not associated with IHC,

often utilize IHC's hospital and surgical facilities for their discretionary patients.

And when one ophthalmologist failed to adequately direct his discretionary

patients to IHC's surgical facilities, IHC refused to reappoint him to its panel of

providers.

For its part, IHC counters that it unilaterally implemented a policy

preferring physicians over other health care providers because physicians have

hospital staff privileges. According to IHC, this is a cost-effective means to

implement regular peer review, quality control, and basic credentialing.[7] On the

---

[7]When granting hospital privileges to physicians, the hospitals verify the

(continued...)

other hand, it is undisputed that IHC has recognized a need to panel other types of ancillary providers who do not possess hospital privileges at IHC hospitals. Indeed, IHC has paneled psychologists, social workers, physical therapists, and podiatrists despite their lack of hospital privileges. But IHC contends that it has not needed to panel optometrists in urban areas, such as the Wasatch Front, where there are sufficient panel ophthalmologists to fulfill all enrollees' eye care needs, including NSEC. As support for this contention, IHC points to the fact that it has paneled optometrists in other geographic markets where ophthalmologists cannot meet the needs of its enrollees. For example, though no optometrists are paneled to serve enrollees on the Wasatch Front specifically, throughout Utah IHC has paneled thirty optometrists.

IHC also notes that all its panel providers are subject to the termination of privileges provision cited above—it is not a provision specific to ophthalmologists. In other words, IHC could terminate privileges of any panel provider if he or she failed to adequately use IHC's facilities—it did not need to agree to exclude optometrists in order to bring that pressure to bear on ophthalmologists. Moreover, Dr. Miller, who derives approximately sixteen

_____

[7](...continued)
applicant's health care training, education, malpractice insurance, as well as investigate the applicant's background. By preferring providers with staff privileges, IHC suggests that it avoids unnecessary credentialing costs and duplicative efforts.

percent of his annual income from services provided to IHC enrollees, has, since 1985, performed most of his surgeries at the Intermountain Surgical Center as a matter of convenience. IHC acquired that building in 1995. Therefore, that he performs the majority of his surgeries at an IHC facility is not the result of a conspiracy between IHC and the ophthalmologists, but Dr. Miller's longstanding practice.

Finally, IHC contends that limiting the size of the panel allows IHC to negotiate lower payments to the panel providers since their patient volume will increase. In fact, there is substantial empirical evidence that selective contracting allows managed care companies to contain health care costs—the more restrictive the panel, the lower the cost of the premium to the subscriber.

As noted above, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," *Matsushita*, 475 U.S. at 588, and we hold that the Plaintiffs have not presented enough evidence from which a jury may infer an antitrust conspiracy. There is simply nothing in the record tending to show that IHC excluded optometrists *in exchange* for an agreement by its panel ophthalmologists to direct their discretionary patients to IHC facilities. Rather, the Plaintiffs' argument simply assumes the existence of concerted action because panel ophthalmologists complained to IHC about paneling optometrists, because IHC responded to those complaints by not paneling optometrists, and because

panel ophthalmologists refer some of their discretionary patients to IHC facilities in accordance with IHC's provider agreement. Notably absent is evidence of a link between the second and third circumstances.

That optometrists provide lower-cost NSEC does not alter the analysis. Although the Plaintiffs have provided evidence that IHC may have saved money in the provision of NSEC by paneling optometrists, the Plaintiffs have failed to provide evidence to show that on the whole, IHC's decision is against their economic interests. The financial consequences of adding optometrists is multi-dimensional given both the economics of managed care and the vertically integrated nature of IHC's business. IHC has provided a legitimate rationale for its decision, and, as we noted earlier, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*

Our holding today finds support in our case law as well as that of other circuits. In *Todorov v. DCH Healthcare Authority*, for example, the plaintiff neurologist argued that the hospital conspired with the radiologists on its staff to exclude the plaintiff from performing services that he was qualified to perform but that were traditionally performed exclusively by the radiologists. 921 F.2d 1438, 1444–45 (11th Cir. 1991). The radiologists, who had an economic incentive to limit the number of health care providers performing such services,

could not achieve this objective on their own. Therefore, several of the radiologists recommended to the hospital that the plaintiff's request for privileges be denied. *Id.* at 1443. The hospital, in fact, followed such recommendation and denied the plaintiff privileges. *Id.* at 1444. The Eleventh Circuit held that there was insufficient evidence of a conspiracy between the radiologists and the hospital to survive summary judgment, stating that although "[t]hese facts suggest that the hospital *may* have conspired with the physicians[,] . . . they do not . . . exclude the possibility that the hospital acted unilaterally, and procompetitively, in denying him the privileges he requested." *Id.* (emphasis added); *see also World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1475 (10th Cir. 1985) (dealer's complaints about a price-cutting competitor and seller's action in response does not tend to exclude the possibility of independent conduct).

In *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, the plaintiff clinical psychologists raised nearly identical concerns as the optometrists in this case—the defendant insurers refused to pay for services rendered by psychologists, although they paid for identical services when billed through a psychiatrist. 624 F.2d 476, 478 (4th Cir. 1980). While there was evidence that contact between the Neuropsychiatric Society of Virginia ("NSV") and the defendants was "particularly close," that the NSV recommended to the defendants that they terminate direct payments to psychologists, and that Blue

Shield implemented that recommendation, the Fourth Circuit held that there was no evidence of an agreement between the two entities. *See id.* at 478, 483. The court noted that "absent some form of coercion," it is not illegal for a seller of services "to make recommendations aimed at persuading [the buyer of such services] to adopt its proposal." *Id.*

In *Cooper v. Forsyth County Hospital*, the plaintiff podiatrists sought surgical privileges at the defendant hospital. 789 F.2d 278, 279 (4th Cir. 1986). The hospital's bylaws, however, restricted surgical privileges to physicians. *Id.* Nevertheless, the hospital undertook a review of the bylaws to determine whether they should be changed to allow the podiatrists surgical privileges. *Id.* Orthopedists, who performed the majority of foot surgery at the hospital, objected to amendment of the bylaws. *Id.* Ultimately, the proposal was rejected. *Id.* Relying on *Monsanto*, the court found that the circumstantial evidence of a conspiracy—contacts, communications, and the mere opportunity to conspire—constituted "insufficient evidence from which to infer an anticompetitive conspiracy." *Id.* at 281.

A concurring opinion in *Cooper* proffered the following analysis:

Section 1 of the Sherman Act clearly prohibits members of a medical-dental staff from agreeing with one another to coerce a hospital's trustees to deny privileges to members of a competing profession for the purpose of furthering their economic self-interest. A jury could properly infer the existence of such an unlawful agreement from *evidence of threats made to the trustees of mass*

-24-

*resignations* by the members of the medical-dental staff and the absence of demonstrably sound reasons relating to the quality of patient care underlying the defendants' actions.

*Id.* at 282 (Motz, J., concurring) (emphasis added).

Our own case law also reflects a concern that something more than mere acquiescence to a competitor's complaints about a price-cutter be present to infer a conspiracy. In *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, for example, the defendants terminated a relationship with a hospital regarded as a low-cost provider of quality healthcare when other regional hospitals agreed to reduce their maximum allowable payments ("MAPs"). 899 F.2d 951. In finding sufficient evidence of a conspiracy, we did not rest on evidence of a motive or opportunity to conspire. *Id.* at 963. Instead, we relied on evidence that the decision to seek reduced MAPs from the regional hospitals and the decision to terminate the plaintiff's contract was "related," as well as evidence that the competitors' reduced rates were conditioned on the termination of the plaintiff's contract—both of which tended to exclude the possibility of independent conduct. *Id.* at 964.

Here, the record reflects that IHC prefers to panel health care providers who have staff privileges at IHC hospitals. Ophthalmologists, by law, can perform more procedures than optometrists. Therefore, even if IHC were to include optometrists on its provider panels, it would still need to panel

ophthalmologists. This fact, coupled with IHC's procompetitive justification for limiting the number of paneled health care providers—that is, limiting the number of providers performing a given service increases the volume of patients each provider sees, which, in turn, enables IHC to negotiate lower reimbursement rates to the panel providers—suggests that IHC may have acted independently in deciding not to panel optometrists on the Wasatch Front. Although it is tempting to treat the Plaintiffs' evidence in this case as sufficient evidence of a conspiracy to survive summary judgment, the only permissible inference to be drawn from it is that IHC responded to the ophthalmologists' complaints by deciding not to panel optometrists. There is no evidence to suggest that the ophthalmologists threatened a mass resignation, *see Cooper*, 789 F.2d at 282 (Motz, J., concurring), that the ophthalmologists conditioned their rates on the exclusion of the optometrists, *see Reazin*, 899 F.2d at 964, or that the ophthalmologists in any way coerced IHC to exclude optometrists, *see Va. Acad. of Clinical Psychologists*, 624 F.2d at 483. In the absence of these types of "plus" factors, to permit an inference of antitrust conspiracy on the basis of IHC's response to complaints "and thus to expose the defendant to treble damage liability[,] would both inhibit management's exercise of independent business judgment and emasculate the terms of the [the Sherman Act]." *Monsanto*, 465 U.S. at 764 (quotations

omitted).[8]

B.    Tying Arrangement

The Plaintiffs next argue that IHC unlawfully tied the sale of NSEC to the sale of IHC managed care plans.  This claim strikes at the heart of an entire industry devoted to the efficient distribution of health care.  Although there are many conceptual hurdles to holding that such an arrangement amounts to a violation of the antitrust laws—indeed, as the Plaintiffs would have it, the arrangement at issue amounts to a *per se* violation of the antitrust laws—there is nothing in our jurisprudence to indicate that managed care companies and the products they sell should be treated any differently than participants and products in other industries.

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product.'" *Eastman Kodak v. Image Technical Servs., Inc.*, 504 U.S. 451, 461 (1992) (quoting *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5–6 (1958)).  Tying arrangements are unlawful "[b]ecause they deny competitive access to the tied

---

[8]The Defendants also argue that the Plaintiffs lack standing to assert their group boycott claim under § 1.  We need not address that issue, however, as we conclude that the Plaintiffs failed to present sufficient evidence of a conspiracy. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1030 (10th Cir. 2002) (declining to address whether plaintiffs suffered an antitrust injury for purposes of standing when claims were resolved on other grounds).

product market on the basis of the seller's leverage in the tying product market, and force buyers to forego free choice between sellers." *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 834 (7th Cir. 1978). In this case, the Plaintiffs allege that IHC tied the sale of managed care plans in Utah (the "tying" product) to the provision of NSEC (the "tied" product). In other words, the Plaintiffs contend that purchasing an IHC managed care plan also requires the buyer to purchase NSEC only from an IHC panel ophthalmologist, rather than from a different source such as an optometrist. The District Court concluded that the Plaintiffs failed to establish the existence of two separate products, which is a necessary prerequisite to a finding of an illegal tie. *See Sports Racing Servs., Inc. v. Sports Care Club of Am.*, 131 F.3d 874, 886 (1997) (citing *Eastman Kodak*, 504 U.S. at 462). The court concluded that IHC "only market[s] a single product: access to health care priced to subscribers and paid to health care providers according to prior arrangements made with those providers." *Abraham*, 394 F. Supp. 2d at 1319–20.

Whether products can be considered distinct "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink*, 126 S. Ct. 1281 (2006). That is, "the mere fact that two items are complements, that 'one . . . is

useless without the other' does not make them a single 'product' for purposes of tying law." *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001) (quoting *Jefferson Parish*, 466 U.S. at 19) (alteration in original; internal citation omitted). Given this backdrop, the Plaintiffs contend that managed care plans in Utah and NSEC are separate products because "there is separate consumer demand for such eye care services" apart from the sale of managed care plans. Indeed, IHC admits that there a substantial consumer demand for optometric services apart from the sale of managed care plans. There is also evidence that IHC's enrollees want to patronize optometrists rather than IHC panel ophthalmologists for NSEC and that enrollees sometimes visit optometrists—and pay for services out of their own pocket—rather than visiting one of IHC's panel ophthalmologists. Therefore, the Plaintiffs argue that managed care plans and NSEC are two products.

On the other hand, in the only case with similar facts to those at issue here, the Ninth Circuit held to the contrary. In *Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1289 (9th Cir. 1983), the plaintiff claimed a tie between a health plan's pharmacy benefits and restrictions on the pharmacies enrollees could use to reap the plan's benefits. The Ninth Circuit held that the benefits and the restrictions were one product, reasoning that:

Insureds, the consumers, certainly did not consider these as two separate products. In deciding whether to buy the pharmacy benefit, they made just one decision, comparing the expected cost of the benefit plus copayments for drug purchases against the expected cost of drugs bought at the independent pharmacies. The risk insureds sought to transfer was the risk of high pharmacy bills. The product these consumers sought was a means by which they could satisfy their drug needs on favorable terms. Their purchase of drugs in the required manner was the consummation of the pharmacy benefit, not an unwanted and unnecessary product tied to the desired product.

*Id.* at 1290; *see also De Modena v. Kaiser Found. Health Plan, Inc.*, 743 F.2d 1388, 1396 (9th Cir. 1984) (rejecting the premise that "a drug plan and the drugs provided under that plan are separate commodities.").

It has been suggested, however, that *Klamath-Lake* sweeps too broadly:

Th[e] reasoning [in *Klamath-Lake*] implies that *any* bundling of health insurance with the provision of medical goods and services is a single product. For all such insurance, the consumer choosing a plan compares its premium plus expected copayments against the expected cost of buying the covered medical goods and services from independent suppliers. And the purchase of the medical goods and services from the plan is the consummation of the insurance benefit. But this logic is far too sweeping. For *any* tie, a rational buyer compares the expected cost of the bundle to the expected cost of buying the items unbundled elsewhere. And, having contracted for the bundle, receiving the bundle is the consummation of the buyer's contract. Thus, literally applied, the courts' logic suggests that all ties involve single products.

10 Phillip E. Areeda & Herbert Hovencamp, *Antritrust Law* ¶ 1745g4 (2004) (hereinafter "Areeda & Hovencamp").

We agree with this analysis. Although powerful economic reasons may justify the bundling of medical insurance with the provision of the goods and

services that fall within the plan's parameters,[9] such bundling does not transform the managed care plan itself and the provision of its benefits into a single product.

Our analysis, however, does not end there. It is undisputed that IHC does not sell NSEC and that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product." *Jefferson Parish*, 466 U.S. at 12. Although it is critical to a tying claim that the seller forced a buyer to purchase the tied product in order to get the tying product, "it is not critical that the buyer have purchased the tied product *directly from the seller*." *Sports Racing Servs.*, 131 F.3d at 887. Because the alleged tying arrangement at issue involves the sale of the tied product by a third party—namely, panel ophthalmologists—distinct from the sale of the tying product, we must evaluate IHC's economic interest in the sale of the tied product. We have explained:

> An illegal tie may be found where the seller of the tying product does not itself sell the tied product but merely requires the purchaser of the tying product to buy the tied product from a designated third

---

[9]Professor Areeda suggests, for example, that such integration can reduce transaction costs, reduce the incentive to overconsume "that otherwise results when the insured patient or physician can order any medical goods and services they wish without regard for cost because the [traditional] insurer reimburses all costs," and it reduces utilization of expensive and excessive testing. 10 Areeda & Hovencamp, Antitrust Law ¶ 1745g4. Furthermore, such bundling can reduce the cost to enrollees as the managed care company rightly assumes that though it provides access to a host of medical services, a majority of enrollees will not utilize them all.

party rather than from any other competitive source that the buyer might prefer.

However, where a third party is involved in selling the tied product to the plaintiff, most courts have required that the tying product seller have a direct economic interest in the sale of the tied product before an illegal tying arrangement will be found.

Courts that have imposed the economic interest requirement when the tied and tying products are sold by different, unrelated sellers have done so generally on the grounds that if the tying product seller does not have an economic interest in the sale of the tied product, the seller is not attempting to invade the alleged tied product or service market in a manner proscribed by section 1 of the Sherman Act.

*Sports Racing Servs.*, 131 F.3d at 887–88 (internal citations and quotation

omitted).

Unlike the cases in which courts have held the "economic interest"

requirement satisfied because the seller of the tying product receives an economic

benefit from the sale of the tied product, *see, e.g.*, *id.* at 888 (seller of racing

services received economic benefit from third party sale of race cars); *Thompson*

*v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1570–72 (11th Cir. 1991) (defendant

multi-listing service required real estate brokers wanting to use the service to join

branch of realtor organization in which service may have had an interest), *Ohio-*

*Sealy*, 585 F.2d at 833–34 (licensor of mattress trademark required licensee-

manufacturers to purchase mattress component from a particular source and

licensor received a percentage of component sales), in this case, IHC receives no

economic benefit from the sale of NSEC. To the contrary, IHC reimburses its

panel ophthalmologists each time they provide NSEC. Far from profiting from the sale of NSEC, IHC *expends* money when NSEC is sold. We therefore conclude that IHC has no economic interest in the sale of NSEC. The Plaintiffs' tying claim fails for this reason.[10] *See Beard v. Parkview Hosp.*, 912 F.2d 138, 140–44 (6th Cir. 1990) (no tying arrangement where hospital required its patients to purchase radiology services from third party from whom hospital received no economic benefit); *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104 (4th Cir. 1987) (no tying arrangement where hospital required CT scans to be interpreted by specific group of radiologists and where hospital did not compete in the market for interpretations of CT scans and did not receive any of the radiologists' fee for their interpretations); *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1407–08 (9th Cir. 1984) (no tying arrangement where airline offered lower-priced tickets if the purchaser also rented a car from a particular company because there was no evidence the airline had an economic interest in car rentals).

### III. SECTION 2 CLAIMS

_____

[10]The Plaintiffs also allege that IHC unlawfully tied the sale of SEC—in addition to NSEC—to its managed care plans. Two types of parties have standing to challenge illegal tying arrangements—"the purchasers who are forced to buy the tied product to obtain the tying product . . . and the competitor who is restrained from entering the market for the tied product." *Sports Racing Servs.*, 131 F.3d at 887. As the Plaintiffs neither purchase nor provide SEC, they lack standing to assert this claim.

In contrast to § 1 of the Sherman Act, which reaches only concerted action, § 2 extends both to concerted and unilateral conduct. Under that section, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce . . . shall be deemed guilty of a felony." 15 U.S.C. § 2. The Plaintiffs allege that IHC attempted to monopolize the surgical facilities market on the Wasatch Front.[11] Specifically, the Plaintiffs allege that IHC leveraged its power in the managed care market to increase its power in the surgical facilities market: because health care providers desire to be included on IHC provider panels—which serve a substantial portion of the population of the Wasatch Front—those providers are willing to agree to send as many patients as possible to IHC surgical facilities in exchange for paneling. This, in turn, has the effect of increasing IHC's presence in the surgical facilities market. We agree with the District Court that the Plaintiffs lack standing—with respect to both its request for damages under § 4 of the Clayton Act as well as its request for injunctive relief under § 16 of the Clayton Act—to pursue this claim.

The concept of "antitrust standing," which extends to suits arising under

---

[11]The Plaintiffs also contend that IHC and its panel ophthalmologists conspired to monopolize the market for surgical facilities. Because we held in section II.A that the Plaintiffs failed to present sufficient evidence of a conspiracy, this claim likewise fails.

both § 4 and § 16 of the Clayton Act, is distinct from that of constitutional standing. *See B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 666 (10th Cir. 2006). The threshold inquiry in analyzing whether a plaintiff may pursue an antitrust claim is that of "antitrust injury." *Id.* at 667; *Todorov*, 921 F.2d at 1449. An antitrust injury is an "injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *B-S Steel*, 439 F.3d at 667 (quotations omitted). The Plaintiffs carry the burden to make this demonstration. *See Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1321 (9th Cir. 1996).

In this case, the Plaintiffs make no attempt to delineate *any* injury they have suffered or will suffer that is associated with IHC's dominance in the surgical facilities market, let alone explain how that injury is "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."[12] *Associated Gen. Contractors of Cal., Inc. v.*

---

[12]Significantly, the Plaintiffs do not allege that part of the monopolization attempt involved the *quid pro quo* discussed in Part I.A. *supra*. Instead, the Plaintiffs simply contend that IHC agreed to panel ophthalmologists in exchange for an agreement to refer patients needing surgery to IHC surgical facilities. Moreover, to the extent that the Plaintiffs' argument could be construed in such a way, their claim fails because such allegedly anticompetitive conduct does not result in a dangerous probability of successfully monopolizing the surgical facilities market. *See Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 693 (10th Cir. 1989) (stating that to state a claim for attempted monopolization, a plaintiff must show that there is a dangerous

(continued...)

*Carpenters*, 459 U.S. 519, 535 n.31 (1983).  Indeed, the Plaintiffs completely fail to discuss how IHC's purported plan to monopolize the surgical facilities market bears any relation to the practice of optometry or any other interest the Plaintiffs could possibly allege was invaded as a result of that plan.  Rather, the Plaintiffs' argument on this point simply assumes the existence of standing, as their briefing on the matter is devoted exclusively to an examination of the elements of a § 2 claim.  This is insufficient to meet the Plaintiffs' burden.

Moreover, a plaintiff seeking damages under § 4 must also demonstrate that it is an efficient enforcer of the antitrust laws.  *B-S Steel*, 439 F.3d at 667; *Todorov*, 921 F.2d at 1449, 1450.  Factors to be considered in this analysis include the directness or remoteness of the injury suffered by the plaintiff, which, in turn, depends on the existence of other more directly-injured possible

---

[12](...continued)
probability that the defendant would achieve monopoly status in the relevant market as the result of the predatory conduct alleged by the plaintiffs).  During the time period in which IHC was allegedly causing ophthalmologists to refer substantially all of their discretionary patients for surgery at IHC facilities, eye surgeries accounted for only a small proportion of surgeries at IHC hospitals—between 6% and 7%—and amounted to less than 3% of IHC's surgical revenues.  Despite the fact that IHC had, at the relevant time, a 51% to 55% share of the surgical facilities market, there is no evidence to suggest that even complete success in directing all SEC patients to IHC's hospitals would result in monopoly power in provision of surgical facilities.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir. 1991) (stating that monopoly power is defined as "the ability to control prices and exclude competition"); *Colo. Interstate Gas Co.*, 885 F.2d at 694 n.18 (monopoly power generally exists when defendant controls 70% to 80% share of the relevant market).

plaintiffs.  *See Todorov*, 921 F.2d at 1451; *Associated Gen. Contractors*, 459 U.S. at 542 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party [to bring suit].").  The Plaintiffs here have "no natural economic self-interest" in preserving competition in the market for surgical facilities.  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 444 (2d Cir. 2005).  On the other hand, other regional providers of surgical facilities "have a direct and undivided economic interest" in obtaining referrals to its hospitals and in ensuring that IHC is not acting unlawfully in obtaining referrals to its facilities.  *See id.*  Though not an exhaustive list, in this case it is clear that—at minimum—non-IHC surgical facilities on the Wasatch Front and consumers of surgical facilities on the Wasatch Front would be more directly harmed by IHC's alleged attempt to monopolize the market for surgical facilities.  For this additional reason, the Plaintiffs here lack standing.

## V.  OUTSTANDING MOTIONS

There are also two outstanding motions we must briefly address.  The first motion regards a protective order entered by the District Court pursuant to Fed. R. Civ. P. 26(c).  The protective order designates a part of the record below as confidential, and in essence, subject to review only by counsel and the court as

needed for adjudication of the case. The order expressly states that its protections "shall survive the termination of the litigation." Following the entry of summary judgment, the Defendants filed a motion to enforce the protective order, which a panel of this court provisionally granted, reserving the issue for reconsideration by the merits panel. The Plaintiffs' motion for reconsideration of that ruling is now before us. Generally, "[a]s long as a protective order remains in effect, the court that entered the order retains the power to modify it, even if the underlying suit has been dismissed." *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990). "[M]odification of a protective order, like its original entry, is left to the discretion of the district court." *Id.* The Plaintiffs did not seek modification of the order in the District Court, nor do they argue here that the District Court abused its discretion in imposing the protective order in the first place. Rather, they argue that the protective order automatically dissolved during the final stages of pretrial preparations and accordingly there is nothing left to enforce. This assertion is belied by the order's own terms, which indicates it was intended to "survive the termination of the litigation." We therefore deny the motion to reconsider.

The Plaintiffs also filed a motion to supplement the record along with a supplemental appendix. That motion is granted.

## VI. CONCLUSION

For the foregoing reasons, we conclude the Plaintiffs failed to present evidence of a conspiracy between the defendant ophthalmologists and IHC that tends to exclude the possibility of independent conduct. We also conclude that the Plaintiffs have failed to raise a genuine issue of fact on their tying claim because they failed to show that IHC has an economic interest in the sale of NSEC. Finally, we conclude that the Plaintiffs have failed to demonstrate standing to assert their § 2 claims. We therefore AFFIRM the District Court's disposition of this matter.